UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
MARQUI REYES,

                 Petitioner,

           - against -

                             OPINION & ORDER
                             06-CV-3673 (SJF)

JOSEPH T. SMITH, Superintendent of Shawangunk
Correctional Facility,

                 Respondent.
-------------------------------------------------------------------X
FEUERSTEIN, J.

On September 9, 1999, a judgment of conviction was entered against petitioner Marqui

Reyes ("petitioner") in the County Court of the State of New York, Suffolk County (Lefkowitz,

J.), upon a jury verdict finding him guilty of one (1) count of murder in the second degree (N.Y.

Penal Law § 125.25(2)), and imposition of sentence. On July 24, 2006, petitioner filed a petition

seeking a writ of habeas corpus pursuant to 28 U.S.C § 2254. For the reasons set forth herein,

the petition is denied and the proceeding is dismissed.


I.      BACKGROUND

      A.     Factual Background[1]

           1.     The People's Case

                 a.     The 9-1-1 Call

---

[1] The following facts were taken from the trial transcript (T.) and sentencing minutes (S.).

1

Joseph Lee ("Lee") testified that on September 12, 1997, he was lying in bed at his home located at 208 Timberline Drive in Brentwood, New York when he heard loud noises which he believed to be fireworks. (T. 1787). Lee testified that he looked out of an open window and observed a car "moving slowly" in the roadway with the driver's side door slightly open and the interior lights on, (T. 1787-88), and two (2) men, later identified as petitioner and Amiri Robinson ("Robinson") "facing each other" in the street. (T. 1790). According to Lee, he thought the two (2) men were "horsing around." (T. 1790-91). Lee testified that when Robinson began banging on his front door, he called the police. (T. 1791). Lee further testified that Robinson broke his front window and that when he looked through the broken window, he observed "a figure of a man" running south[2], away from the scene. (T. 1804-05).

b.    The Investigation

On September 11, 1997, Officer Cesar Rivera ("Rivera") was assigned to Unit 318 in the Third Precinct. (T. 1410). Rivera testified that around 12:29 a.m. on September 12, 1997, he arrived at 208 Timberline Drive in response to a dispatch call that stated that there was a burglary in process with shots fired. (T. 1411-1412). Other officers who arrived at the scene around the same time included Officers Troy Gibson and Dave Rivera. Rivera testified that the officers approached the house on 208 Timberline Drive and observed a black male, later identified as Robinson, lying on the ground "partly twisted;" a broken window; and blood on the door. (T. 1412, 1416). Rivera testified that the officers requested the assistance of a rescue squad and

---

[2] Timberline Drive runs north and south, intersecting with Mockingbird Place to the north and Melody Lane to the south. (T. 1429-31). At the time of the incident, Lee's house was on the west side of Timberline Drive, between the intersections with Melody Lane and Mockingbird Drive. (T. 1430).

additional police officers, secured the scene and visually searched the area for anyone with a weapon. (T. 1431-1433).

Suffolk County Homicide Detective Eugene Walsh ("Walsh") testified that he arrived at the scene with Detective James Roys ("Roys") around 1:05 a.m. on September 12, 1997. (T. 2779). Walsh also testified that Detective Thomas Riley, Detective-Sergeant Tom Groneman and other detectives from the Third Squad were also at the scene. (T. 2780). Walsh observed a blood-stained gold Oldsmobile Aurora with the engine running in front of 201 Timberline Lane, which was later identified as the car Robinson was using on the night of his murder. (T. 2782). A search of Robinson's car yielded three (3) shell casings, two (2) expended bullets (one (1) in the window and one (1) on the driver's side) and one (1) live ammunition round. (T. 2788-89). Detective William Rathjen ("Rathjen") of the Suffolk County Police Department's Identification Section ("ID Section") testified that a beeper was also found in the car. (T. 1531-39). Rathjen further testified that four (4) shell casings and one (1) live bullet were recovered from inside and outside of the vehicle[3], (T.1538-39), and that he was not able to secure any fingerprints from the pager, the live bullet or the four (4) expended casings. (T. 1543, 1568).

Dr. Stuart Dawson ("Dawson"), Suffolk County Deputy Chief Medical Examiner, performed the autopsy of Robinson's body. On direct examination, Dawson testified: (a) that one (1) shot had been fired at close contact range to the front of Robinson's right ear, (T. 2321-24); (b) that after entering Robinson's head, this bullet exited through his left cheek, (T. 2326-27), without coming into contact with the brain, (T. 2349-57); and (c) that this injury would not have been

---

[3] Three (3) casings and one (1) live round were recovered from inside the car while one (1) casing was located out on the roadway. (T. 1539).

"immediately fatal". (T. 2349-50). Dawson further testified that other shots were fired to the right side of Robinson's forehead, (T. 2353), left forearm, (T. 2364), and to the back of Robinson's neck. (T.2383). Dawson explained: (1) that the bullet that entered Robinson's forehead traveled through soft tissue and exited through his left eyebrow, (T. 2352-55, 2357-59, 2361); (2) that the injury from that bullet was not fatal, (T. 2361); (3) that the non-fatal bullet which entered Robinson's left forearm near the wrist traveled through two and one-half (2 ½) inches of soft tissue and exited near his elbow, (T. 2367-69, 2371); and (4) that the bullet that entered the back of Robinson's neck and exited from his right cheek was also not fatal and did not likely render Robinson immobile. (2385-86).

Dawson testified that another bullet struck Robinson on the left front side of his head "creating a large ragged area of destruction about three quarters (3/4) to one (1) inch in diameter right in the center of the brain," (T. 2404), which created a "tremendous shock." (T. 2405). This bullet traveled downward through Robinson's skull and rendered Robinson immobile. (T. 2406-08). Dawson testified that the injury caused by that bullet was "a hundred percent fatal." (T. 2406). On cross-examination, Dawson testified that he believed that particular bullet was the last to be fired. (T. 2558). Dawson further testified that he could not rule out with scientific certainty that Robinson was not already fatally wounded before he reached the doorstep of 208 Timberline Drive. (T. 2579, 2630).

Rathjen testified that Robinson's vehicle was recovered and towed to the Crime Lab garage for investigation where it was photographed, dusted for fingerprints and examined for evidence. (T. 1571-75). Rathjen testified that he lifted several fingerprints from the car and

determined that petitioner's prints were on the exterior of the passenger side window and on the roof over the passenger side of the car. (T. 1588-1590, 1592-94).

Kosciuk testified that a blood trail at the scene indicated that Robinson ran in a zig-zag pattern from the roadway onto the front stoop of Lee's house. (T. 1936-37,1947). Kosciuk further testified that bloodstains on the doorknob of Lee's front door indicated that Robinson opened the storm door and repeatedly banged on the front door. (T. 1948-49). Kosciuk and Lee also testified that Robinson broke the window closest to the front door with his fist. (Lee: T. 1814, Kosciuk: T. 1949, 1953, 2064).

Crime Lab forensic serologist and crime scene analyst Charles Wagner ("Wagner") analyzed samples of all of the bloodstains found in and on Robinson's car, as well as those found in the roadway. (T. 2668-2669). Wagner testified that Robinson's blood was found on the front passenger seat of the vehicle, in the roadway and near the curb. (T. 2668-2669).[4]

c.   The 57 Chestnut Street Shooting

Suffolk County Police Officer Paul Rocchio ("Rocchio") testified that at approximately 9:42 p.m. on September 12, 1997, he responded to petitioner's house to investigate a report of a disturbance with possible shots fired.[5] (T. 2729-31). As Rocchio approached the house, he heard petitioner yell out "over here" from the front lawn. (T. 2732). According to Rocchio, he repeatedly asked petitioner whether he had phoned the police and why he had done so. (T. 2732-

---

[4] The parties also stipulated to DNA analysis conducted by Crime Lab Forensic Scientist Linda Reich, indicating that Robinson was the source of the blood recovered from the roadway, the car console, the passenger side of the roof, the exterior of the front passenger window and three (3) of the bloodstains on the passenger seat (T. 2685-86). Bloodstains from the curb, one (1) stain from the passenger seat, and blood left behind from petitioner's fingerprint on the roof of the car could not conclusively be identified (T. 2685-2686).
[5] At the time of the incident, petitioner resided at 115 Timberline Drive in Brentwood, New York (T. 2902, 3705).

5

33). Rocchio testified that petitioner was "extremely upset, alarmed, [and] afraid" and admitted to having called the police. (T. 2732). According to Rocchio, petitioner was "not paying attention" and instead was "monitoring the traffic that was going by." (T. 2732). Rocchio testified that petitioner told him that members of a street gang called the Legion of Doom ("L.O.D.") were after him and were going to kill him. (T. 2733).[6] Sensing that petitioner was "ignoring" him, Rocchio suggested that they step inside the house. (T. 2733).

Rocchio testified that once inside petitioner's house, he again attempted to interview petitioner in the presence of approximately three (3) of petitioner's family members. (T. 2733-34). According to Rocchio, petitioner's father demanded to know why the police had been called to their house, (T. 2734), and petitioner explained that members of the L.O.D. had gone to 57 Chestnut Street in Brentwood to find him and had shot his girlfriend's cousin, whom they believed to be petitioner. (T. 2735). According to Rocchio, petitioner explained that the L.O.D. members believed he had killed Robinson and were seeking retaliation. (T. 2735).

Rocchio testified that petitioner followed him outside as he was leaving and explained that members of the L.O.D. had already been to his home and had cut the tires on a car in the driveway. (T. 2739-40). Rocchio then left petitioner's home and went to 57 Chestnut Street, where he observed another crime scene. (T.2740).


    d.   <u>Petitioner's Arrest</u>

Detective Walsh testified that on September 13, 1997, after receiving information from Police Headquarters in Yaphank naming petitioner as a suspect involved in the shooting death of

---

[6] Petitioner testified at trial that he believed Robinson was the leader of the L.O.D. (T. 3708).

Robinson, (T. 2814, 2818-19), he and Anderson went to petitioner's house to speak with him about Robinson's death and the 57 Chestnut Street shooting. (T. 2822-23). Petitioner was not at home, but his mother gave Walsh a list that had been prepared by petitioner of the L.O.D. members petitioner believed were responsible for the 57 Chestnut Street shooting and were coming after him. (T. 2823-25).

Walsh and Anderson then went to 78 Kernochan Avenue, Hempstead, where petitioner was staying, and spoke to petitioner, who told them that he had information about the 57 Chestnut Street shooting and could identify who had been involved. (T. 2828-29). According to Walsh, petitioner agreed to accompany them to police headquarters to identify the L.O.D. members from police photographs. (T. 2829).

As they drove toward police headquarters, petitioner explained that he had learned about the Chestnut Street shooting from his girlfriend Athena Mikell ("Mikell"). (T. 2833-34). Mikell and petitioner were together while Mikell was on the telephone with her cousin who was at 57 Chestnut Street at the time of the shooting. (T. 2833-34). Petitioner told Walsh that he dialed 9-1-1 to report the incident and to advise of his belief that members of the L.O.D. were involved and would be going to his house. (T. 2833-34). Petitioner explained to Walsh that he and Mikell's cousin looked alike and that the L.O.D. members believed petitioner was responsible for Robinson's shooting. (T.2835). Walsh testified that during the drive to headquarters, petitioner was advised of his constitutional rights, which he waived both orally and in writing. (T. 2841-42).

Petitioner initially told the detectives that on the evening of Robinson's death, he and Robinson had discussed Robinson's "record production business" for approximately ten (10) minutes at petitioner's home, (T.2843-44), then Robinson left and petitioner cleaned his kitchen.

(T. 2844-45). According to Walsh, petitioner admitted to subsequently seeing police down the block, sometime after midnight, but claimed that he did not know why they were there or that Robinson had been killed. (T. 2846). Petitioner told the detectives that at 9:00 a.m. the following day, he first learned from Robinson's brother, Kudora Robinson ("Kudora"), that Robinson had been killed down the block. (T.2846). Petitioner stated that Kudora and his friend, "Beauville," were "looking at him kind of funny," (T. 2847), and that later that day, four (4) L.O.D. members arrived at petitioner's home. (T. 2847). Petitioner told the detectives that he spoke to the L.O.D. members through a window and that one (1) of those individuals said "we got something for you" and "we'll get up with you," notwithstanding that petitioner denied any involvement in Robinson's death. (T.2847-48).

Walsh, Anderson and petitioner arrived at the Yaphank Police Headquarters at about 2:35 p.m., (T. 2848), at which time petitioner was accompanied to an interview room and was told to "hang loose" while Walsh signed the *Miranda* card from which petitioner had previously been read his rights. (T. 2849, 2854).

Walsh testified that during questioning in the interview room, petitioner denied ever being in Robinson's car or seeing Robinson after he left petitioner's house, (T. 2863-64), even after he was told that his fingerprints had been lifted from Robinson's car. (T. 2866). The detectives told him that they could prove he killed Robinson and petitioner asked Walsh, "how much time can I do?" (T. 2865-67). Walsh responded that the decision would not be his. (T. 2867). Walsh testified that petitioner then admitted that he had shot Robinson, but justified the shooting by claiming that Robinson would have killed him otherwise. (T. 2867). According to Walsh, petitioner explained that he had owed Robinson about one thousand five hundred dollars

8

($1,500.00) for drugs, that he knew Robinson had killed other people, and that Robinson had threatened to "fuck him up." (T. 2867-68).

Walsh testified that contrary to his original story, petitioner then stated that Robinson had appeared at his home, told petitioner to take a ride with him, and drove them south on Timberline Drive. (T. 2868). According to Walsh, petitioner stated: (1) that Robinson began to smack him in the head and mouth and to yell at him; (2) that he believed Robinson was "coming at him," so he grabbed Robinson's gun, which was in a black fabric holster sticking out from between the car seats, and began to shoot; (3) that he shot Robinson approximately three (3) times while in the car; (4) that both men then exited the car; (5) that Robinson fought with petitioner on the street; (6) that more shots were fired outside the car; and (7) that he fired the last shot at Robinson from about fifteen (15) feet away as Robinson ran towards Lee's house at 208 Timberline Drive. (T. 2869-2871, 2905).[7] Walsh testified that petitioner said he had no choice but to keep shooting Robinson because Robinson could identify him. (T. 2871). Petitioner further stated that he stopped shooting only when the gun jammed, at which point he ran away (T. 2811).

Petitioner told Walsh that after the shooting: (1) he drove Mikell's car to Timberland Park, where he burned his clothes and the gun holster, (T. 2873-75); (2) he then drove to 401 Main Street in Islip, where he threw his Timberland boots into a bush, (T. 2873-75); and (3) then he drove to the Captree Bridge, where he threw the gun into the water. (T. 2875).

At about 4:30 p.m., petitioner admitted that he owned the gun with which he had shot Robinson and that he had recently purchased it from a person in Central Islip, whom he could not

---

[7] Detective Rathjen testified that petitioner also fired another round at Robinson which missed him and became lodged in the siding of the house just above the house number "208." (T. 1558). Detective Kosciuk testified that the evidence at the scene indicated that Robinson fell off the front stoop and onto the ground, where he ultimately died. (T. 1970-1972).

identify. (T. 2877-79). Walsh also testified that petitioner eventually admitted to having disposed of the evidence at Soundview Park in the Bronx, where he burned his clothes and holster on the ground, threw his boots into a bush and threw his gun and the magazine with one (1) live round in it into the water. (T. 2879-2881). Petitioner agreed to show the detectives where he disposed of the evidence and to give a written statement. (T. 2881).

Walsh testified that at about 5:05 p.m., petitioner was read his *Miranda* rights for a second time, which he again acknowledged and waived. (T. 2898-2902). Thereafter, the detectives took a written statement from petitioner, which was then read aloud to him, signed and sworn to by him, and notarized by Walsh. (T. 2895, 2902-2908). Petitioner also drew a sketch of the crime scene depicting where the events in his statement occurred, which he signed and dated. (T. 2924-2926). Walsh testified that petitioner declined to give a video statement and signed a statement to that effect. (T. 2941-2942).

Walsh testified that at approximately 11:10 p.m., petitioner went with Walsh, Anderson and Detective-Sergeant Fandrey to Soundview Park in the Bronx, (T. 2947-2949), where he showed them the remnants of his burnt clothing, (T. 2950-2952), the spot where he had thrown his Timberland boots, (T. 2959), and the place where he had thrown his gun and clip into the Bronx River. (T. 2961). Petitioner's holster clip was discovered on the shoreline. (T. 2952-2953, 2962). Police Officer Wayne McLaughlin of the Harbor Unit Scuba Team testified that on December 21, 1997, petitioner's gun and clip were retrieved from the Bronx River. (T. 2707-08). Crime Lab Forensic Scientist George Reich testified that all of the expended and live bullets and expended casings found at the crime scene had been discharged from the recovered weapon. (T. 3300-15).

10

2.    The Defense

Petitioner testified on his own behalf. Petitioner testified that in the spring of 1997, he began to sell drugs purchased on consignment from Robinson, (T. 3729-30), and that in the spring and summer of 1997, he began to use the drugs he was buying from Robinson. (T. 3729- 3732). Eventually, petitioner's debt to Robinson rose to one thousand five hundred dollars ($1,500.00) and Robinson declined to continue to sell him drugs on consignment. (T. 3732-3733). Although petitioner eventually paid the principal on his debt to Robinson, (T. 3733), Robinson sought an additional one thousand five hundred dollars ($1,500.00) as interest on the debt, which petitioner could not pay. (T. 3735-3736). Petitioner testified that Robinson began appearing at his job and home and threatened to hurt or kill him if he did not pay Robinson the money owed him. (T. 3737-3739). Petitioner testified that a result of Robinson's threats, he purchased a .380 caliber handgun for two hundred dollars ($200.00), which he carried with him at all times. (T. 3740, 3843-52).

Petitioner testified that on September 11, 1997, he received a telephone call from Robinson (T. 3740-41). At approximately 11:30 p.m. that night, petitioner was sitting in front of his house with his girlfriend, Mikell, when Robinson drove up in his gold Oldsmobile Aurora and directed petitioner to get in. (T. 3741-42).

Petitioner testified that Robinson, who was talking on his cell phone, drove south on Timberline Drive for a distance, made a u-turn and then stopped the car in front of Lee's house. (T. 3743-44). Robinson repeatedly demanded that petitioner pay him the money he was owed, and when petitioner said he did not have it, Robinson smacked him and threatened to hurt him and "to kill [his] bitch ass." (T. 3744-46). Petitioner testified that when Robinson stopped hitting him,

11

he reached under his seat. (T. 3747). According to petitioner, he believed Robinson was going to pull out a gun, so petitioner pulled out his own gun. (T. 1787-89, 2904, 3743, 3747). When Robinson turned and saw petitioner holding a gun, Robinson asked, "What are you doing with that?", at which time petitioner "cocked the gun back" and told Robinson to leave him alone. (T. 3747-48). Petitioner testified that Robinson then lunged at him, which prompted petitioner to fire his weapon. (T. 3749). According to petitioner, he first shot Robinson in the head because his head was closest to the gun when petitioner reacted. (T. 3749). When Robinson "came at" petitioner a second time, petitioner fired several more shots. (T. 3749).

Petitioner testified that he and Robinson exited the car after the initial shots were fired and Robinson "came at" him again. (T. 3750-52). Once outside the vehicle, the two (2) men began to struggle. (T. 2904, 3752). Petitioner testified that he shot Robinson a fourth time. (T. 2904, 3752). On direct examination, petitioner testified that he only stopped shooting Robinson when his gun jammed, at which point he ran away from Robinson. (3753-3754). According to petitioner's testimony, the last time he saw Robinson alive was on the lawn of 208 Timberline Drive. (T. 3753-3754).

Once home, petitioner washed up and changed his clothes, then drove to the Bronx, (T. 3756-57), where he burned the clothes he had been wearing during the altercation with Robinson, (T. 3737-38); threw the boots he had been wearing during the shooting into a bush; and threw his gun and its magazine into the Bronx River. (T. 3537-58). Petitioner testified that after disposing of the evidence, he went home. (T. 3757-58).

3.    Jury Deliberations, Verdict and Sentence

12

At the conclusion of trial, the jury was instructed, *inter alia*, on the crime of murder in the second degree, both intentional (N.Y. Penal Law § 125.25(1)) and depraved indifference (N.Y. Penal Law § 125.25(2)), (T. 4504-12), as well as on the defense of justification. (T. 4413-4523). At the end of the second full day of deliberations, the jury sent the following note to the court: "We have a situation. We cannot come to a unanimous decision." (T. 4562). The court then provided an *Allen* charge, after which the jury was sequestered for a third night. (T. 4572-73).

On the second day of deliberations, court was scheduled to begin at 9:00 a.m., but petitioner's counsel did not arrive until 9:25 a.m. (T. 4555). The court warned counsel at the end of the second day of deliberations as follows:

> "The Court: So the record is complete, [the jury] lost a half hour of deliberation this morning because I couldn't get the defense team in the courtroom before 9:35. Tomorrow we're going to start at 9 a.m. So that the record is complete, I'm going to take the bench at 9 a.m. and I'm going to bring the jury in at 9 a.m. And they're going to sit with me and we'll wait for the attorneys to arrive. And then I'll wish them a good morning and then they can commence their deliberations.
>
> Have a good evening. See you tomorrow morning at 9 a.m.
> Anybody know they have a problem, tell me now, because I'm not going to accept it. Put it on the record. I'm going to do exactly what I said I'm going to do."

(T. 4573-74).

As promised, on the third day of deliberations the court commenced at 9 a.m. by instructing the jury as follows:

> "The Court: [...] I want you to know that you're going to commence your deliberations now. But until such time as we have all of the attorneys here, I will not be able to respond to any of your questions or readbacks. We have called the case for 9 a.m. You're here. I'm here. The People were here. We're ready to go. I'm going to ask you to commence your deliberations now."

(T. 4577).

When petitioner and his counsel arrived, the court informed them as follows:

> "The Court: Good morning again. Record will indicate that the defense attorneys did in fact grace us with their presence at 9:15. The [petitioner] has been brought out. It's 9:20.
>
> As I said to you yesterday, I was going to start at 9 a.m. We started at 9 a.m. in your absence, gentlemen."

(T. 4578).

Shortly thereafter, the jury found petitioner not guilty of intentional murder, but guilty of depraved indifference murder in the second degree. (T. 4586-89).

On September 9, 1999, petitioner was sentenced to an indeterminate term of imprisonment of twenty-five (25) years to life. (S. 21-22).

B.     Procedural History

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department on the grounds: (1) that his constitutional right to be present at a material stage of his trial was violated by the court's decision to commence deliberations in his absence; (2) that his constitutional right to a jury trial was violated when the court discharged one of the jurors; (3) that the trial court's instructions to the jury on the defense of justification were inaccurate and misleading; (4) that New York Penal Law §125.25(2) is unconstitutionally vague; (5) that the verdict was against the weight of the evidence; and (6) that the sentence imposed was unduly harsh and excessive. (App.'s Brief i-ii). On February 23, 2004, the Appellate Division, Second Department affirmed the judgment of conviction, finding, *inter alia*: (1) that there was no violation of petitioner's right to be present at all material stages of trial;

14

(2) that the sentence imposed was not excessive; and (3) that petitioner's remaining claims were unpreserved for appellate review and, in any event, without merit. People v. Reyes, 4 A.D.3d 541, 542, 771 N.Y.S. 2d 706 (2d Dept., 2004). On July 23, 2004, the New York State Court of Appeals denied leave to appeal the order of the Appellate Division. People v. Reyes, 3 N.Y.3d 661, 782 N.Y.S. 2d 703 (2004).

Petitioner subsequently filed an application for a writ of *error coram nobis* to vacate, on the ground of ineffective assistance of counsel, the Appellate Division's February 23, 2004 order affirming petitioner's judgment of conviction. By order dated October 11, 2005, the Appellate Division, Second Department denied petitioner's application for a writ of *error coram nobis*, finding that petitioner had failed to establish that he was denied the effective assistance of appellate counsel. People v. Reyes, 22 A.D.3d 609, 801 N.Y.S.2d 750 (2d Dept. 2005). On January 31, 2006, the New York State Court of Appeals denied leave to appeal the October 11, 2005 order of the Appellate Division. People v. Reyes, 6 N.Y.3d 780, 811 N.Y.S.2d 347, 844 N.E.2d 802 (2006).

On or about July 24, 2006, petitioner filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging: (1) that he was denied effective assistance of appellate counsel; (2) that the verdict was against the weight of the evidence; (3) that New York Penal Law § 125.25(2) is impermissibly vague; (4) that his constitutional right to be present at a material stage of his trial was violated by the court's decision to commence deliberations in petitioner's absence on the third day of deliberations; and (5) that his constitutional right to a jury trial was

15

violated when the court discharged one of the jurors from the jury[8]. Respondent filed his return on January 25, 2007.[9]

## II.    DISCUSSION

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, governs applications of incarcerated state court defendants seeking federal habeas corpus relief.

### A.    Procedural Requirements of the AEDPA[10]

Pursuant to the AEDPA, a federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in

---

[8] During *voir dire*, the trial judge asked all prospective jurors, including Virginia Waraich ("Waraich"), *inter alia*, whether "anybody on the jury or anyone in your family or very close friend [had] been the victim of a crime, witnessed a crime, or convicted of a crime?" (T. 550). Waraich failed to disclose any criminal history on the part of her family during *voir dire*. After Waraich was sworn in as Juror no. 9, the court became aware that Waraich was discussing relevant matters with other jurors that she had failed to disclose during *voir dire*, (T. 2413), including, *inter alia*, that (1) "her sister was a defendant in a case," (T. 2416), on which Ms. Merrifield was the prosecuting attorney, (T. 2416, 2424); (2) that when asked by another juror whether she could "put that out of [her] mind," "[a]ll [Waraich] said was ... '[t]he bitch didn't get my sister,'" (T. 2417, 2427-2428); and (3) that Waraich's "sister's boyfriend" had been incarcerated on a "gun charge" and that "[s]he doesn't have the most favorable position of the police and stuff like that." (T. 2417, 2433-2434). Upon being summoned to the trial judge's chambers, (T. 2440), Waraich indicated: (1) that her sister had been accused of a crime by a woman named "Angel," (T. 2446), who was the girlfriend of Waraich's ex-boyfriend, (T. 2443, 2449); (2) that her use of the word "bitch" was in reference to Angel, not Ms. Merrifield, (T. 2446-50);(3) that she neither knew who the prosecutor in her sister's case was nor had ever been present in the courtroom in which her sister was tried, (T. 2444); and (4) that she had not spoken to any of the other jurors about her sister's matter. (T. 2444). When asked why she failed to disclose her sister's case during *voir dire*, Waraich testified that although she remembered being asked about her family's criminal background, she had not heard the word "accused" in the court's question. (T. 2447-48). Waraich also eventually conceded to the trial judge that she had discussed her sister's criminal matter with the other jurors, in violation of the court's order, explaining that it was "[j]ust conversation. I mean, I just talk about my family." (T. 2448). Upon motion by the prosecutor pursuant to N.Y. C.P.L. § 270.35, the trial judge discharged Waraich as "grossly unqualified." (T. 2502).

[9] The state court record was not received by this Court until September 30, 2008.

[10] It is undisputed that all of the claims raised by petitioner in his habeas corpus petition were exhausted in state court as required by AEDPA.

a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). In order to establish the procedural default of a federal habeas claim, the state court's reliance on state law must be "clear from the face of the opinion." Coleman, 501 U.S. 722, 735, 111 S.Ct 2546, 2557. See also, Messiah v. Duncan, 435 F.3d 186, 195 (2d Cir. 2006); Fama v. Commissioner of Correctional Services, 235 F.3d 804, 809 (2d Cir. 2000). If a state court holding contains a plain statement that a claim is denied based on a procedural default, then the federal habeas court may not review that claim even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 1044, 103 L. Ed. 2d 308 (1989) ("a state court need not fear reaching the merits of a Federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision) (emphasis in original). When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is procedurally defaulted. Glenn v. Bartlett, 98 F.3d 721, 725 (2d. Cir. 1996) (internal quotations and citations omitted). See also Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005); Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007).

The Appellate Division, Second Department rejected the following claims as "unpreserved for appellate review" pursuant to N.Y. C.P.L. § 470.05(2): (1) that New York Penal Law § 125.25(2) is unconstitutionally vague; and (2) that the court's discharge of a sworn juror denied him the constitutional right to be tried by a jury in whose selection he had participated. Reyes, 4 A.D.3d 541, 541, 771 N.Y.S. 2d 706 (2d Dept., 2004). The Appellate Division only ruled on the merits of those claims "in any event." Id. Since the Appellate Division clearly invoked a state procedural rule as a basis for its rejection of those claims, and petitioner has not alleged cause for

17

the procedural default, actual prejudice, or that it would be a fundamental miscarriage of justice if those claims were not reviewed, those claims (petitioner's third and fourth grounds for relief) are dismissed.

      B.      Claims Adjudicated on the Merits

           1.      Standard of Review

An application for a writ of habeas corpus that has met the procedural prerequisites of the AEDPA,

> "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)); see also Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006) (accord).

Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000); 28 U.S.C. § 2254(d)(1). Alternatively, a federal habeas corpus court may "'grant the writ if the state court identifies the correct governing legal principle from

18

[the Supreme] Court's decisions but unreasonably applies that principle to the facts' of a petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520, 123 S. Ct. 2527, 2534-35, 156 L. Ed. 2d 471 (2003) (citing Williams, 529 U.S. at 413, 120 S. Ct. 1495, 1523). Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S.Ct. At 1522; see also Wiggins, 539 U.S. at 521, 123 S. Ct. at 2535 (holding that for the "unreasonable application" prong of the AEDPA to be satisfied, the state court's decision must have been "objectively unreasonable"). Under the AEDPA, determination of the factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

###### 2.     Ineffective Assistance of Counsel Claim

Petitioner contends that his appellate counsel was ineffective for failing to raise a claim of ineffective assistance of trial counsel for his trial counsel's failure to move to dismiss the count of depraved indifference murder on the basis that the evidence was "more consistent with an intentional crime." (Pet. 6).

The Sixth Amendment provides, *inter alia*, that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must prove both: (1) that counsel's representation "fell below an objective standard of reasonableness"

19

measured under "prevailing professional norms," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 689, 694 104 S.Ct. 2052, 2055, 80 L. Ed. 2d (1984). A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." <u>Knowles v. Mirzayance</u>, 129 S.Ct. 1411, 1422, 173 L. Ed. 2d 251 (2009) (quoting <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct at 2068). To prove a claim of ineffective assistance of counsel, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. <u>Knowles</u>, 129 S. Ct. at 1420 (quoting <u>Strickland</u>, 466 U.S. at 689, 104 S.Ct. at 2068). A petitioner may rebut this presumption only by demonstrating that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." <u>Strickland</u>, 104 S.Ct at 2066, 466 U.S. at 690.

Although the Supreme Court formulated the <u>Strickland</u> two-pronged test in the context of an ineffective assistance of trial counsel claim, it has since extended application of that standard to ineffective assistance of appellate counsel claims. <u>Smith v. Robbins</u>, 528 U.S. 259, 285-86, 120 S.Ct. 746, 764, 145 L. Ed. 2d 756 (2000). A petitioner may demonstrate ineffective assistance of appellate counsel by showing that his or her appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." <u>Clark v. Stinson</u>, 214 F.3d 315, 322 (2d Cir. 2000) (citing <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994)). However, a petitioner may not rebut the presumption of effective assistance by simply arguing that his or her appellate counsel's decision to raise certain issues and not others constitutes ineffectiveness. <u>See, Strickland</u>, 466 U.S. 668, 689, 104 S.Ct 2052, 2065. Appellate

20

counsel is not required to "press nonfrivolous points, *** if counsel, as a matter of professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L. Ed. 2d 987 (1983); see also Knowles, 129 S.Ct. at 1422 ("The law does not require counsel to raise every available nonfrivolous defense").

> a. Reasonableness of Representation

The representation afforded petitioner by his appellate counsel did not fall below an objective standard of reasonableness under prevailing professional norms. See Strickland, 466 U.S. 668, 689, 104 S.Ct 2052, 2065; Jones, 463 U.S. 745, 751, 103 S.Ct. 3308, 3312. Petitioner claims that "the evidence [at trial] was diametrically opposed to the statutory meaning of Murder with a Depraved Indifference to human life" and "more consistent with an intentional crime."[11] (Pet. 5). Therefore, petitioner argues, his trial counsel was ineffective for not moving to dismiss this charge and his appellate counsel deprived him of effective assistance on appeal when he failed to raise an ineffective assistance of trial counsel claim.

Petitioner has failed to establish that his trial counsel's failure to move to dismiss the

---

[11] Under current New York law, a defendant cannot be convicted of depraved indifference murder where the evidence suggests only an intent to kill. See People v. Payne, 3 N.Y.3d 266, 786 N.Y.S.2d 116, 819 N.E.2d 634 (2004). However, the law to be applied in a habeas proceeding is "the law as it existed at the time of petitioner's trial and direct appeal." Williams v. Phillips, 207 Fed. Appx. 489, 490-91 n. 2 (2d Cir. 2008) (citing Policano v. Herbert, 507 F.3d 111, 114 (2d Cir. 2007)). Payne was not decided until October 19, 2004, eight (8) months after petitioner's direct appeal was decided. At the time of petitioner's conviction and direct appeal, People v. Register, 60 N.Y.2d 270, 469 N.Y.S.2d 599, 457 N.E.2d 704 (1983), held that "[d]epraved mind murder resembles manslaughter in the second degree (a reckless killing which includes the requirement that defendant disregard a substantial risk [Penal Law, 125.15, subd 1; 15.05, subd 3] ), but the deprived mind murder statute requires in addition not only that the conduct which results in death present a grave risk of death but that it also occur '[u]nder circumstances evincing a depraved indifference to human life.' This additional requirement refers to neither the mens rea or actus reus. If it states an element of the crime at all, it is not an element in the traditional sense but rather a definition of the factual setting in which the risk creating conduct must occur." Register, 60 N.Y. at 276, 469 N.Y.S.2d 599.

depraved indifference murder charge was objectively unreasonable. As there are numerous ways to provide effective assistance in any given case, simple disagreements over trial strategies and tactics are insufficient to establish ineffectiveness. See Knowles, 129 S.Ct. at 1420 ("[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable") (citing Strickland, 446 U.S at 681, 104 S.Ct. at 2061). ("[T]he strategic choices made [by counsel] ... will seldom if ever be found wanting. Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment") (quotations and citation omitted)). Petitioner has not established that the failure of his trial counsel to move to dismiss the depraved indifference murder charge was anything other than sound trial strategy, particularly because the state of the law in New York at the time of his direct appeal on this issue was unsettled. Moreover, petitioner's testimony that he pulled his gun because he believed Robinson was going to pull out a gun and that he fired his gun in reaction to Robinson lunging at him, (T. 1787-89, 2904, 3743, 3747, 3749), provided a basis for considering whether he acted unintentionally. See Parker v. Duncan, 255 Fed. Appx. 565, 565-66 (2d Cir. 2007). Thus, petitioner's trial counsel was not ineffective for failing to raise this claim and it follows that his appellate counsel was not ineffective for failing to raise an ineffective assistance of trial counsel claim.

Nor has petitioner pointed to any other defect in his trial counsel or appellate counsel's representation that fell below an objective standard of reasonableness under prevailing professional norms. Petitioner's trial counsel, *inter alia*, presented a reasonable defense, interposed appropriate objections, effectively cross-examined witnesses, and delivered cogent

22

opening and closing statements. Moreover, petitioner's appellate counsel accurately and
adequately described the factual background of the case, raised six (6) issues and the
corresponding case law for each, and argued intelligibly for each of the six (6) claims. See United
States v. DiPaolo, 804 F.2d 225, 234-35 (2d Cir. 1986) (holding that defendants were not denied
effective assistance of counsel where counsel appeared well prepared and had good understanding
of facts and legal principles involved in case); Gonzalez v. United States, 337 F. Supp. 2d 419,
423 (E.D.N.Y. 2004) ("So long as the challenged attorney is prepared with relevant facts and
appropriate legal standards, strategic decisions regarding the challenging of evidence ... cannot be
second-guessed in an effort to support an ineffective assistance of counsel claim"). "For judges to
second-guess reasonable professional judgments and impose on appointed counsel a duty to raise
every 'colorable' claim suggested by a client would disserve the very goal of vigorous and
effective advocacy ...." Jones, 463 U.S. at 754, 103 S.Ct. at 3314. See also Sellan v. Kuhlman,
261 F.3d 303, 317 (2d Cir. 2001) (holding that the "process of winnowing out weaker arguments
on appeal and focusing on those more likely to prevail, far from being evidence of incompetence,
is the hallmark of effective appellate advocacy." (citing Smith v. Murray, 477 U.S. 527, 536, 106
S.Ct. 2661, 2667 (1986)) (internal quotation omitted).


      b.    Prejudice

In any event, petitioner cannot establish any prejudice resulting from his trial counsel's
failure to move to dismiss the depraved indifference murder charge, i.e., that there is a reasonable
probability that, but for his trial counsel's failure to move to dismiss the depraved indifference
murder charge, the proceeding would have resulted more favorably to petitioner. Under state law

existing at the time of petitioner's conviction, the trial court likely would not have granted any motion to dismiss the depraved indifference murder count. See Register, 60 N.Y.2d 270; See also Policano, 507 F.3d 111.

Thus, petitioner has not demonstrated that the Appellate Division's denial of his application for a writ of *error coram nobis* is contrary to, or involved an unreasonable application of, federal law, or that its decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. See 28 U.S.C. § 2254(d). Accordingly, habeas corpus relief is not warranted with respect to petitioner's claim of ineffective assistance of appellate counsel.

### 3. Weight of the Evidence Claim

Petitioner's claim that the verdict was against the weight of the evidence does not present a federal constitutional issue. See Rodriguez v. O'Keefe, No. 96 Civ. 2094, 1996 WL 428164, at * 4 (S.D.N.Y. Jul. 31, 1996), aff'd, 122 F.3d 1057 (2d Cir. 1997); see also Young v. Greiner, 296 F.Supp.2d 334, 347 (E.D.N.Y. 2003) (holding that a weight of the evidence claim does not present a federal constitutional issue); Correa v. Duncan, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001) (holding that because a "weight of the evidence" claim is a pure state law claim, a federal court is precluded by 28 U.S.C. § 2254[a] from considering the claim). Accordingly, petitioner's "weight of the evidence" claim is dismissed.

### 4. Right to be Present Claim

Petitioner claims that his constitutional right to be present at a material stage of his trial

was violated when, on the third morning of jury deliberations and in the absence of petitioner and his trial counsel, the trial court instructed the jury to commence its deliberations. According to petitioner, the trial court's direction to commence deliberations was a supplemental instruction, which was an integral aspect of trial at which he had a right to be present.

A criminal defendant's right to be present at trial is rooted in the Confrontation Clause of the Sixth Amendment which guarantees the defendant the right to be present at trial to confront the witnesses and evidence against him. U.S. v. Tureseo, 566 F.3d 77, 83 (2d Cir. 2009) (citing United States v. Gagnon, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L. Ed. 2d 486 (1985)). "[T]his right to be present has been extended to other critical stages of trial beyond those related to the defendant's rights to confronting witnesses and evidence." Tureseo, 566 F.3d at 83.

A defendant "has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." Tureseo, 566 F.3d at 83 (citing Kentucky v. Stincer, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667 (1987) (internal quotations omitted); see e.g., Faretta v. California, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 45 L. Ed. 2d 562 (1975) ("[A]n accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings"); United States v. Rivera, 22 F.3d 430, 438 (2d Cir.1994) ("Due Process requires that a defendant be present at all stages of the trial to the extent that a fair and just hearing would be thwarted by his absence") (internal quotations and citations omitted). "[T]he constitutional right to be present at one's own trial exists 'at any stage of the criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure.'" Tureseo, 566 F.3d at 83 (quoting Stincer, 482 U.S. at 745, 107 S.Ct. 2658). However, a defendant may waive this

right. See, e.g. United States v. Peterson, 385 F.3d 127, 138 (2d Cir. 2004). "To establish waiver, the District Court must conduct a record inquiry to determine whether the defendant's absence was 'knowing and voluntary' and without sound excuse...." Tureseo, 566 F.3d at 83-84 (citing United States v. Hernandez, 873 F.2d 516, 518-19 (2d Cir. 1989)). Even when the right to be present has been waived by the defendant, "the District Court must then determine whether 'there was on balance a controlling public interest to continue the trial in the defendant's absence.'" Tureseo, 566 F.3d at 84 (citing United States v. Fontanez, 878 F.2d 33, 35 (2d Cir. 1989)).

Any error in continuing the trial in the defendant's absence is reviewed for harmlessness, i.e., "whether the error 'created any reasonable probability of prejudice.'" Tureseo, 566 F.3d at 84 (quoting Fontanez, 878 F.2d at 37); United States v. Toliver, 541 F.2d 958, 965 (2d Cir.1976) (holding that the test for harmlessness turns on whether the error "created any reasonable possibility of prejudice"); Stincer, 482 U.S. at 745, 107 S.Ct. 2658 (holding that right to be present is not guaranteed "when presence would be useless, or the benefit but a shadow" (internal citation and quotation marks omitted)). A defendant's right to be present does not extend to instances in which the defendant "could have done nothing had he been [present], nor would he have gained anything by attending." Gagnon, 470 U.S. at 527, 105 S.Ct. at 1485.

Although jury instructions are an essential part of a defendant's trial, see Tureseo, 566 F.3d 77, the trial court's directive, in petitioner's absence, that the jury commence deliberations did not constitute a supplemental jury instruction. Rather, the court's directive was a "ministerial communication ... wholly unrelated to the substantive legal or factual issues of the trial." People v. Harris, 76 N.Y.2d 810, 812, 559 N.Y.S.2d 966, 559 N.E.2d 660 (1990).

In any event, petitioner has not demonstrated how his presence on the morning of the third

26

day of deliberations would have benefitted his defense, or that his absence compromised the fairness of the trial. Accordingly, petitioner's constitutional rights were not violated when the trial court directed the jury to resume deliberations in petitioner's absence. See e.g. Hernandez v. Edwards, 98 Civ. 6704, 2001 WL 575594, at * 5 (S.D.N.Y. May 29, 2001) (holding that the defendant's right to be present was not violated by the reading of a supplemental instruction in defendant's absence). Therefore, the Appellate Division's finding that the petitioner's right to be present at all material stages of trial was not violated was not contrary to, nor an unreasonable application of federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d). Thus, habeas relief is not warranted in this claim.


III.     CONCLUSION

The petition for a writ of habeas corpus is hereby denied in its entirety and the proceeding is dismissed. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(1); see also Miller-El v. Cockrell, 537 U.S. 322, 335-36, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from

27

the Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED.

SANDRA J. FEUERSTEIN
United States District Judge

Dated: November 2, 2009
Central Islip, New York